# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ROBERT E. GOMILLA-LEVY,      )
                                )
          Plaintiff,      )
                                )
vs.                          )    Case No. 4:07CV1648 AGF
                                )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,   )
                                )
          Defendant.    )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Robert Gomilla-Levy was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be affirmed.

This is the second time this matter has come before this Court.  Most of the facts relevant to Plaintiff's claim for benefits, including Plaintiff's work history and medical record, are as set out in this Court's December 5, 2005 Memorandum and Order in Gomilla-Levy v. Barnhart, No. 4:04-CV-0942 (AGF) (Doc. #16) (the "2005 Order").  For the convenience of the parties, those pages from the 2005 Order are attached as Appendix

---

[1]    The parties have consented  to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

A[2] to this Memorandum and Order. In the earlier case, the Court reversed the decision of the Administrative Law Judge ("ALJ") dated August 29, 2003, that Plaintiff was not disabled, and remanded for further proceedings.[3] The Court held that the ALJ had failed fully to consider whether Plaintiff met the requirements of a deemed-disabling impairment listed in the Commissioner's regulations, namely, Listing 1.02 (major dysfunction of a joint with regard to his right knee). This listing provides in relevant part that a claimant is presumptively disabled if his impairments satisfy four requirements:

> [1] gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and [2] chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and [3] findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. [4] Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, Subpt. P, App. 1 § 1.02.

The Court explained that the failure of the ALJ to make specific findings as to this listing would not necessitate a reversal if the decision that Plaintiff did not meet the listing was supported by substantial evidence. As the Court noted, the Commissioner did

---

[2] Citation to the record transcript in the Appendix are the same as the current record.

[3] By way of background, Plaintiff had previously been awarded disability benefits based upon a disability onset date of December 1, 1993, due to obesity, which met the requirements of the Commissioner deemed-disabled listing for obesity then in effect. In August 1996, Plaintiff returned to work and his benefits were discontinued. He worked intermittently at various unskilled jobs through August 2000. Plaintiff filed the present applications for benefits in December 2000, alleging lower back pain, right knee pain, and obesity.

not argue that Plaintiff's condition did not satisfy the first three requirements of Listing

1.02A; rather, the Commissioner argued that Plaintiff did not show an inability to

ambulate effectively. In the 2005 Order, the Court discussed each of the first three

requirements in turn. Regarding the first requirement, the Court stated: "This Court

cannot say that the record supports the conclusion that the first requirement of Listing

1.02 is not met." Id. at 18. The Court then held that Plaintiff's impairment satisfied the

second and third requirements.

The Court then considered the fourth requirement, namely the inability to

ambulate effectively, quoting the Commissioner's regulations, which provide as follows:

> What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § 404, Subpt. P, App. 1 § 1.00B2b.  The Court found itself "without the benefit of reasoning by the ALJ" on the matter.  The ALJ's finding that Plaintiff was capable of "standing or walking" two hours in an eight-hour workday, "shed little light" on the ALJ's assessment of Plaintiff's ability to ambulate effectively, as the finding was in the disjunctive and covered an eight-hour period.  The Court found that the medical records were likewise indeterminate as to Plaintiff's ability to ambulate effectively.  Due to this deficiency, the Court was unable to say that the record supported the overall conclusion that Plaintiff did not meet Listing 1.02, and therefore remanded the case for specific findings on this issue.

On January 19, 2006, the Appeals Council vacated the ALJ's August 29, 2003 decision and remanded the case to an ALJ for further proceedings consistent with the Order of the Court.  Tr. at 314.  On June 27, 2006, a new hearing was held before another ALJ.  At the close of the hearing, the ALJ stated that he would hold the record open for inclusion of the report of a new orthopedic examination he had ordered.  Id. at 520.  On July 26, 2006, Plaintiff was seen by orthopedist Jack Tippett, M.D., and Dr. Tippett's report and medical source statement of that date were provided to Plaintiff's counsel on August 15, 2006.  Id. at 327.

In the letter to counsel accompanying the examination report and statement, the ALJ informed Plaintiff's counsel that he could submit written comments concerning the new report, a statement as to the relevant facts and law, additional records, and written questions to be sent to Dr. Tippett.  Counsel was informed that in addition, he could

request a supplemental hearing, at which Plaintiff would have the opportunity to testify, produce witnesses, and submit additional evidence, and that a request for a supplemental hearing would be granted, unless the ALJ received additional records that supported a fully favorable decision. Further, counsel was told that he could request an opportunity to question witnesses, including Dr. Tippett, a request which would be granted if the ALJ determined "that questioning the witness was needed to inquire fully into the issues." Plaintiff's counsel was told that if the ALJ did not receive a response from counsel within ten days of counsel's receipt of the letter, the ALJ would assume that counsel did not wish to submit any written statements or records and did not wish to request a supplemental hearing or to orally question Dr. Tippett, and the ALJ would then enter the new report and statement into the record and issue his decision. Id. at 327.

By letter faxed to the ALJ on September 13, 2006, Plaintiff's counsel submitted argument and comment regarding Dr. Tippett's report and statement. Counsel wrote that if the ALJ believed "there is not enough evidence contained within the file to render a fully favorable decision then we would request a supplemental hearing, where I would like the opportunity to question Dr. Tippett with regard to his findings." Counsel stated that he was not sure what Dr. Tippett meant when he opined that Plaintiff could stand and walk for at least two hours in an eight-hour work day. Counsel also noted that Dr. Tippett indicated in the new statement that Plaintiff could crouch occasionally, but in an

earlier report (dated May 19, 2003) had opined that Plaintiff could never crouch.  Id. at

330-32.  Without providing any further hearing related to the report, the ALJ issued his

decision on December 21, 2006, finding that Plaintiff was not disabled at any time

through the date of the decision.  Id. at 287.  On February 14, 2007, Plaintiff requested

review by the Appeals Council, which was denied on July 20, 2007.  Id. at 271-72, 268-

70.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands

as the final agency action now under review.

**Evidentiary Hearing of June 27, 2006**

At the June, 2006 hearing, the ALJ opened by explaining to Plaintiff that "I've not

participated [in] nor am I bound by any decisions that have been made in your case."

Plaintiff testified[4] that he was 34 years old, had been separated from his wife for six or

seven years, and had one daughter who was dependent on him for support.  Plaintiff

completed 12th grade at a technical high school and received a certificate in auto body

and auto mechanics from that school, but did not take any college courses.  Id. at 477-80.

After graduating from high school in 1991, Plaintiff began working in 1992.  His

first job was working on an assembly line making wheelchairs.  Plaintiff stated that this

full-time job required him to stand three-quarters of the day, and also to bend and lift.

Plaintiff left this job because he got laid off.  He next worked as a full-time dishwasher

---

[4]    In his opening brief, Plaintiff states that he does not object to the ALJ's summary of
his testimony, at Tr. 279.

for a restaurant, a job which required him to be on his feet the entire day, lift approximately 30 pounds, and bend over to pick big pots up off the floor that he would clean and hang up. Plaintiff testified that he left this job because it was hard on his knees. Id. at 483. He then applied for and was awarded SSI benefits in 1994. After receiving benefits for about two years, he went off SSI voluntarily. Plaintiff explained as follows: "I wanted to, I felt that I was able to work again, I wanted more out of life, I wanted to see what I, see what, it's more out there than just sitting at home all the time. So, that's why I went back to work." Id. at 480-84.

After discontinuing his SSI benefits, Plaintiff's first job was as a tow truck driver. Plaintiff related that he worked 12 hours a day, was on his feet approximately 30 percent of the time, had to lift approximately 30 pounds, and had to bend all the time to change tires. Plaintiff testified that he left this job because working 12-hour days caused a lot of physical pressure and pain. Id. at 484-86.

Plaintiff testified that his next job was at another towing company, at which he worked fewer hours, but at this job he had to do more walking and standing. This job ended when the company went out of business. Plaintiff then returned to his job at the first towing company, but found that he could no longer do the work because of his knees and lower back, and so he left the job. He then worked as a car-washer, a job he was able to handle because each day, he was allowed to take eight to ten breaks, during which he

could lie down for ten to 15 minutes each. Plaintiff testified that his next job was filling orders for auto parts at an auto parts store, a job he left because he could not "take" the walking and standing that was required. The final job that Plaintiff held was as a delivery driver, driving an ice truck. He left this job because the exposure to extreme coldness and the bending and lifting requirements caused his knees to ache. Id. at 486-94.

The ALJ asked Plaintiff to explain why the medical record reflected that Plaintiff received no medical care during the time Plaintiff was working after terminating his SSI benefits. Plaintiff responded that he had no insurance and was taking over-the-counter ibuprofen during that time. Plaintiff testified that the reason he felt he could not currently work was the constant pain he felt in his knees, mainly his right knee. The ALJ observed that Plaintiff had an approximately four-inch lateral bowing of the right knee. Plaintiff testified that in addition, he had pain in his lower back and feet. Counsel referenced medical notes from October 2001 of a physician who recommended that Plaintiff stay off from work for three months, and the absence of an indication in the record that this physician ever stated that Plaintiff could return to work. Id. at 494-98.

Counsel asked Plaintiff why he had not gone for physical therapy which had been recommended, and why he had no medical treatment since 2003, and Plaintiff again responded, "no insurance." He claimed that until 2003, the state paid for his medical care, but then in 2003 "stopped funding it." Counsel returned to questioning Plaintiff

about the pain in his right knee, which Plaintiff described as an eight or nine on a scale of one to ten (with ten being the most pain) most of the day.  Plaintiff testified that his knee swelled and gave out and collapsed on a daily basis.  Although his cane had not been prescribed, he said he never left his house without it.  Inside, he did not need the cane as he could walk steps holding on to a banister, and could hold on to walls if he slipped.  Plaintiff stated that within the past year and a half, his left knee began to bother him as well, which he attributed to favoring that knee to avoid putting pressure on his right knee.  He rated the pain in his left knee as currently a four to six throughout the day.  Id. at 499-503.

Plaintiff consistently experienced back pain at a seven or eight, and for the past few years he had felt "tingling, numbness, swelling" in his feet daily.  Counsel referenced a May 2001 diagnosis of Torsal Tunnel Syndrome in both feet, and Plaintiff testified that he still had the associated feeling of numbness.  Plaintiff stated that as a result of the combination of his problems, he could only stand for 15 minutes before his "knees start giving out [and his] back starts getting heavy" and his feet start hurting.  Plaintiff testified that if he lifted over 15 pounds, his knees buckled.  With his cane, he could walk -- with a limp -- only half a block before having to stop and take a break.  Id. at 503-06.

Plaintiff testified that when he walked up and down steps, his knee pain increased and his knees popped.  He could not do any climbing, it was hard on his knees and back

to bend or crouch, and he could drive for only 20 minutes before experiencing problems with his back, knees, and feet. He testified that he could sit for only 10 to 15 minutes before he had to stretch his legs out, reposition himself, and mold his back. Since May 2003, Plaintiff had lost approximately 70 pounds by dieting, and at the time of the hearing, he weighed about 315 pounds. He made an effort to lose weight because doctors told him if he lost weight, his symptoms might improve, but his back, knee, and foot pain had become worse anyway. For his pain, he took non-prescription ibuprofen twice a day because he could not afford prescription medication.

Plaintiff testified that on a typical day, after he woke up at approximately 7:00 a.m., he could not get out of bed for two to three hours. He was most comfortable lying in bed and spent the majority of his day sitting or lying down. He left his house approximately two to three times per week. When he was sitting or lying down, he consistently used a heating pad and ice and kept his right leg straight and elevated. Because his feet swelled up in shoes, he wore slippers. His sister or wife prepared his meals because he could not stand for long enough to prepare food. He could do household chores for 10 to 15 minutes before he had to take a 10 to 15 minute break. When he was working as a car washer, 10 to 15 minutes of work were followed by an equally long break. Plaintiff testified that he never did the grocery shopping because he could not walk up and down the aisles and because he did not "feel right riding in one of

the electrical cars." When he did laundry in his basement, he stayed in the basement until the laundry was finished, due to his difficulty climbing stairs. Id. 506-14.

Plaintiff testified that his pain constantly affected his concentration and that his "minds off everything else but, it just go [sic] to the pain." Plaintiff gave up his hobby of working on cars because he could no longer bend over. He testified that he no longer had hobbies and that he did not know how to work a computer. Plaintiff stated that there was no previous job that he could still do today, other than the car-washing job, where they let him take breaks and lie down. Plaintiff testified that he could not do a sedentary job because he would have to lay down and reposition himself and elevate his (right) leg and that even when sitting down, he experienced pain that affected his concentration. Additionally, he stated that he had no prior experience with sedentary employment. Id. 514-18.

Upon examination by the ALJ, Plaintiff testified that he currently lived in a two-story home with his wife, eight-year-old daughter, and step-son (who was at college). Plaintiff's bedroom was on the ground floor, and there were 10 to 15 steps down to the basement. Plaintiff's wife, who worked as a receptionist, and sisters had been supporting him for the last several years. Id. 518-20.

Counsel then explained to the ALJ why he believed that Plaintiff met Listing 1.02. Additionally counsel asked the ALJ to take into consideration the fact that Plaintiff

voluntarily gave up SSI benefits and attempted several jobs since then, indicating

Plaintiff's desire to work.  Id. at 520.

**Dr. Tippett's Report and Statement of July 26, 2006**

As noted above, Dr. Tippett examined Plaintiff on July 26, 2006, upon referral by

the ALJ.  Dr. Tippett listed Plaintiff's chief complaints as pain in the right knee, pain in

his left knee, low back pain, and soreness in the left shoulder.  Dr. Tippett described

Plaintiff, who on the date of the examination was 5' 9" tall and weighed 350 pounds, as

"massively obese."  Dr. Tippett observed that Plaintiff had "an obvious outward bowing

of his right lower extremity at the knee and his right foot is externally rotated as he walks.

He uses a cane in his right hand."  Plaintiff was able to get on and off the examining table

without assistance.  On examination, the right knee was "mildly tender," and could flex to

130 degrees.  Dr. Tippett's clinical impressions were as follows: varus deformity of right

tibia in need of correction, external rotation deformities of both hips, obesity, and chronic

low back pain.  Id. at 334-35.

In a Medical Source Statement of Ability to do Work-Related Activities

(Physical), dated July 26, 2006, Dr. Tippett indicated that Plaintiff could stand and/or

walk at least two hours in an eight-hour workday; frequently lift 10 pounds; and

occasionally lift 25 pounds, climb, balance, kneel, crouch, crawl, and stoop.  Dr. Tippitt

further indicated that Plaintiff's ability to sit was not limited, but that due to the marked

bowing of his right leg, bilateral knee pain, and obesity, his ability to push and/or pull was limited (to an unspecified degree) in his lower extremities.  Id. at 337-40.  Dr. Tippet's opinions are similar to those in his report of a consultative examination of Plaintiff on May 19, 2003, although in the earlier report he indicated that Plaintiff could never crouch.  Id. at 183-86.

**ALJ's Decision of December 21, 2006**

Without specifically referencing the Court's conclusions with respect to the first three requirements of Listing 1.02A -- a gross anatomical deformity, chronic joint pain and stiffness, and joint space narrowing -- the ALJ found that Plaintiff did not meet his burden of establishing that he met these requirements.  The ALJ then stated, that even had Plaintiff met this burden, he must also satisfy the requirements of 1.00B2b[5] -- an inability to ambulate effectively, which Plaintiff did not do.  The ALJ stated that there was no medical source statement documenting that Plaintiff could not ambulate effectively.  The ALJ noted Dr. Tippett's opinion that Plaintiff could stand and walk sufficiently to meet the standing and walking requirements of sedentary work.[6]  He also cited to evidence of Plaintiff walking with a normal gait, and noted that "a normal gait and walking with a

---

[5]    In his Opinion, the ALJ apparently incorrectly references Listing 1.02B, rather than either 1.02A or 1.00B2b, which is cross-referenced in 1.02A.

[6]    Sedentary work requires standing and/or walking of a total of no more than two hours in an eight-hour work day.  SSR 96-9p, 1996 WL 374185, at *6-7.

limp would not denote an extreme limitation in the ability to walk." Id. at 280-81.

The ALJ stated that there was no persuasive evidence that Plaintiff's walking was so impaired that he could not carry out the activities of daily living. Plaintiff did not require a walker, two canes, or two crutches to ambulate, and while he testified that he could only walk a half block, the ALJ was not persuaded that Plaintiff could not walk a "mere block" at a reasonable pace on rough or uneven terrain. Id. at 281.

The ALJ turned to consider whether Plaintiff had the RFC to perform his past relevant work or, if not, other work. The ALJ stated that if all of Plaintiff's allegations were fully credible, he would not be able to work. But the ALJ found that these allegations were not consistent with the evidence as a whole and were not "persuasive or fully credible." The ALJ pointed to the absence of any observations by any medical source of Plaintiff being unable to ambulate effectively, as defined in the regulations; medical notes from February 2003, stating that Plaintiff's gait was normal, and from May 2003, stating that he walked with a limp; examinations which showed Plaintiff to be free of edema and that he had full 5/5 strength in his lower extremities; a normal lumbar x-ray (in December 2002); Plaintiff's failure to lose weight despite being medically advised to do so on several occasions; the fact that Plaintiff was only taking an over-the-counter analgesic for pain; Plaintiff's failure to show that he was ever denied treatment because of an inability to pay; recent earnings that were below the amount he would receive from

SSI benefits, suggesting a motive to exaggerate his symptom in order to collect benefits;

and the absence of a medical opinion that he could do no work, as opposed to his prior

work as a mechanic or in construction.  Id. at 282-84.  The ALJ also gave "great weight"

to the functional findings in both of Dr. Tippitt's reports, and noted similar findings by a

state non-examining medical consultant on August 23, 2001 (id. at 144-51), with regard

to Plaintiff's ability to stand and/or  walk.  Based on all of the above, the ALJ found that

Plaintiff had the following RFC:

> [T]he claimant could not engage in prolonged standing or walking, heavy
> lifting or carrying, climb ladders, ropes or scaffolds, or more than very
> infrequently operate controls.  The claimant can lift and carry up to 10
> pounds frequently and 25 pounds occasionally, stand and walk 2 of 8 hours,
> and sit 6 to 8 hours.  The claimant can perform a full range of sedentary
> work and a restricted range of light work.  His limitations on standing and
> walking and operating leg controls prevent him from performing a full
> range of light work.

Id. at 284.

Based on these findings, the ALJ concluded that Plaintiff could not perform his

past relevant work.  The ALJ applied Plaintiff's RFC to perform sedentary work, and

Plaintiff's vocational factors (age, education, work experience) to the Commissioner's

Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("Guidelines"),

which directed a finding of not disabled.  The ALJ also referenced the testimony at the

previous hearing of a vocational expert ("VE"), who had testified that there were

available unskilled sedentary jobs that would require no operation of repetitive right leg

controls; would require no kneeling, crawling, climbing, exposure to cold temperature extremes, or more than very limited stooping or crouching; would permit the worker to change occasionally to stand briefly; and would permit the worker to walk with a cane. (See id. at 253-260.)

**Arguments of the Parties**

Plaintiff begins by asserting that the ALJ was essentially foreclosed from considering the first three requirements of Listing 1.02 by this Court's prior Order, asserting that the 2005 Order determined that Plaintiff met the three requirements of Listing 1.02A. Plaintiff then sets out what he characterizes as the eight items identified by the ALJ as supporting the conclusion that Plaintiff did not meet the final requirement of Listing 1.02A -- an inability to ambulate effectively – and then proceeds to rebut each item.

Plaintiff also argues that the ALJ should have allowed Plaintiff a supplemental hearing at which Plaintiff could have examined Dr. Tippett regarding the July 26, 2006 report. Plaintiff contends that the ALJ failed in his duty to develop a full and fair record regarding the key issue of whether Plaintiff had a marked limitation in his ability to ambulate effectively. Plaintiff maintains that the medical record does not contradict Plaintiff's testimony that he had constant knee pain and could only walk one-half block before needing to stop, and that this testimony establishes the inability to ambulate

effectively.  Plaintiff asks the Court to reverse the ALJ's decision and order the award of benefits, or alternatively, that the case be remanded once again for a proper evaluation of whether Plaintiff has a marked inability to ambulate effectively.

The Commissioner responds that the ALJ properly found that Plaintiff did not meet the requirements of Listing 1.02, properly determined Plaintiff's RFC, and correctly applied the Guidelines, which directed a finding of not disabled.  With regard to Listing 1.02, the Commissioner argues that this Court's 2005 Order did not settle the issue with respect to the first three requirements of Listing 1.02A.  The Commissioner further argues that the ALJ properly considered all the evidence and that his decision is supported by substantial evidence.

## DISCUSSION

## Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted).  This "entails 'a more scrutinizing analysis'" than the substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [the court

must] also take into account whatever in the record fairly detracts from that decision.'"
Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not
warranted, however, "'merely because substantial evidence would have supported an
opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

    To be entitled to benefits, a claimant must demonstrate an inability to engage in
any substantial gainful activity which exists in the national economy, by reason of a
medically determinable impairment which has lasted or can be expected to last for not
less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to
engage in substantial gainful employment must last or be expected to last for not less than
12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

    To determine whether a claimant is disabled, the Commissioner engages in a five-
step evaluation process.  The Commissioner begins by deciding whether the claimant is
engaged in substantial gainful activity.  If so, disability benefits are denied.  If not, the
Commissioner decides whether the claimant has a "severe" impairment or combination of
impairments, defined in 20 C.F.R. § 404.1520(c) as a condition which significantly limits
a claimant's ability to do basic work activities.  If the claimant's impairment is not severe,
the disability claim is denied.  If the impairment is severe, the Commissioner determines
at step three whether the claimant's impairment meets or is equal to one of the
impairments listed in Appendix 1.

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If the claimant is able to perform his past relevant work, he is not disabled. If he cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform other work in the national economy in view of his vocational factors, i.e., age, education, and work experience. If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(g); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

The burden of proof remains with the claimant through the first four steps of this process. At step five, the burden shifts to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with his vocational factors. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines due to nonexertional impairments, such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE on whether there exist jobs in the national economy that the claimant could perform. Id.

Here, the second ALJ determined that Plaintiff met steps one and two, but that Plaintiff did not meet his burden at step three of showing that his physical impairment met or equaled a listed impairment. As such, the ALJ proceeded to step four and found that Plaintiff showed that he could not perform his past work. At step five, the ALJ relied upon the Guidelines and the prior testimony of the VE to find that Plaintiff could do other work, and was thus not disabled.

**The ALJ's Step-Three Analysis - Listing 1.02**

The parties spend much time discussing the effect of this Court's 2005 Order, with Plaintiff asserting that the 2005 Order forecloses further consideration of the first three requirements of Listing 1.02A, and the Commissioner asserting no preclusive effect. The Court agrees with Plaintiff that this Court's prior findings that Plaintiff met the second and third requirements (chronic pain and stiffness; joint space narrowing) of Listing 1.02A are the law of the case. Contrary to Plaintiff's assertion, however, the Court did not decide in the 2005 Order that Plaintiff met the first requirement (gross anatomical deformity); this Court found only that the evidence did not establish that he did <u>not</u> meet it.[7] The matter was therefore remanded for the ALJ to make more detailed findings on

---

[7]    As set forth above, in the 2005 Order the Court first found that the first ALJ did not explain his one-sentence finding that Plaintiff failed to meet any listing requirement. Following Eighth Circuit law, which states that reversal may not be required in such an instance if the record nonetheless supports the ALJ's finding, the Court then proceeded to examine the record for such support. In that process, the Court merely found, with respect to the first requirement, that the evidence did not establish that this requirement

this and other requirements.  The Court now has before it the fully-reasoned finding of the second ALJ that Plaintiff did not have an impairment of listing severity.  Upon review of the entire record, the Court concludes that this finding is supported by substantial evidence.

Even if Plaintiff's bow-legged condition qualifies as a gross anatomical deformity, the ALJ's finding that Plaintiff did not meet the burden at step three of the evaluation process with regard to the inability to ambulate effectively is supported by the record. Dr. Tippett's two reports both stated that Plaintiff could walk for two hours in an eight-hour workday.  The Court finds little merit to Plaintiff's argument that somehow this does not show that Plaintiff could ambulate effectively.  Other evidence in the record also supports this finding, including the findings of Dr. Peterman; one notation in 2003 that Plaintiff walked with a normal gait, and another noting that he walked with a limp; the absence of any prescription for a cane or walker; and the fact that Plaintiff used only one cane.  Further, as set forth above, it is the claimant's burden to establish that his impairment meets or equals a listing.  See Bayley v. Astrue, No. 07-2763, 2008 WL 2512379, at *1 (8th Cir. June 25, 2008) (unpublished per curiam) (citing Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (stating that burden of proof is on claimant to establish that his impairment meets or equals listing; to meet burden, claimant must

_____

was not met.  This is not the same as a finding that Plaintiff had met his burden to establish that he did, in fact, meet the first requirement of the listing.

present medical findings equal in severity to all criteria of listing)).  Plaintiff has not done

so here.

**ALJ's RFC Assessment and Reliance on the Guidelines**

Having properly found that Plaintiff failed to meet his burden at step three, the

ALJ proceeded to steps four and five of the sequential evaluation process.[8]  Upon review

of the entire record, the Court concludes that the ALJ's findings and conclusions through

the remaining steps of the sequential evaluation process were also supported by

substantial evidence.  The ALJ's RFC assessment is supported by Dr. Tippett's findings,

as well as other medical evidence in the record.  The fact that Plaintiff had not sought

treatment from any physicians since 2003 was also a valid factor in discounting

Plaintiff's subjective complaints.  See, e.g., Moad v. Massanari, 260 F.3d 887, 890 (8th

Cir. 2001) (citing Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997) ("failure to

seek medical assistance for her alleged physical . . . impairments contradicts her

subjective complaints of disabling conditions and supports the ALJ's decision to deny

benefits")).

Although Plaintiff testified that he did not seek treatment after 2003 or follow a

recommendation that he get physical therapy, because he could not afford such help, he

did not offer any evidence that he had ever been denied treatment due to an inability to

pay.  See Clark v. Shalala, 28 F.3d 828, 831 (8th Cir. 1994) (finding lack of medical

---

[8]    Asserting that a finding of disability is required at step three, Plaintiff does not
address the ALJ's findings at steps four and five.

treatment was a valid reason to discount the plaintiff's subjective complaints pain, where even though the plaintiff claimed she lacked financial resources for treatment, she offered no testimony that she had been denied treatment or access to prescription pain medication on account of financial constraints).  Based on the guidelines and the testimony of the VE, the ALJ properly found there were a significant number of unskilled, sedentary jobs Plaintiff could perform.

**ALJ's Failure to Hold Supplemental Hearing**

The Court further concludes that the failure of the ALJ to grant Plaintiff an evidentiary hearing after proffering to Plaintiff Dr. Tippett's July 26, 2006 report and medical source statement was not reversible error for several reasons.  First, Plaintiff's request for a hearing was made well beyond the ten days allowed, and there is no indication in the record that Plaintiff had requested or been given an extension of time to make such a request.  Second, Dr. Tippett's findings in July 2006 were essentially the same as those in his report of May 2003, a report which pre-dated the June 2006 hearing.  Thus, Plaintiff essentially had an opportunity to address the evidence from Dr. Tippett that was adverse to his claim.  Further, Plaintiff had the opportunity to comment on and argue the legal significance of Dr. Tippitt's new report.

In Passmore v. Astrue, 533 F.3d 658 (8th Cir. 2008), the Eighth Circuit held that, assuming that due process applied to social security disability hearings, a claimant did not have an absolute due process right to cross-examine providers of medical reports relied

upon by the ALJ, but rather only a qualified regulatory right under 20 C.F.R.

§ 404.950(d)(1).[9]  Id. at 663-65 & n.4; see also Flatford v. Chater, 93 F.3d 1296 (6th Cir.

1996) (cited with approval in Passmore).

In addition, Plaintiff has not shown that the ALJ's decision would have been

different had a supplemental hearing been held.  In sum, this Court concludes that here,

the ALJ did not abuse his discretion or violate Plaintiff's due process rights in not

granting Plaintiff's late request for a supplemental hearing.  See Passmore, 533 F.3d at

666 (concluding that ALJ had not abused his discretion in denying the plaintiff's request

that an examining medical consultant, upon whose opinion the ALJ had relied, be

subpoenaed for cross-examination, where the plaintiff had, among other things, failed to

establish that his desired cross-examination of the consultant "was reasonably necessary

for the full presentation of his case").

---

[9]    This section provides as follows:

> When it is reasonably necessary for the full presentation of a case, an
> administrative law judge or a member of the Appeals Council may, on his
> or her own initiative or at the request of a party, issue subpoenas for the
> appearance and testimony of witnesses and for the production of books,
> records, correspondence, papers, or other documents that are material to an
> issue at the hearing.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of February, 2009.

## Appendix A

## Work Record

Plaintiff's testimony and earnings records indicate the following employment history. Plaintiff graduated from high school in 1991. After high school, he worked as a wheelchair assembler for three to four months, but was not kept on because he was sitting down too much. He then worked as a dishwasher at a restaurant for about a month, but was not able to perform the work because it required too much standing. At that point, in 1993, Plaintiff applied for SSI, which was awarded without a hearing on March 3, 1994. In 1996, Plaintiff went back to work as a yardman for a towing company, walking or driving around the lot to find cars, for three or four months. Plaintiff next worked as a tow truck driver for less than a year. Beginning in 1997, Plaintiff worked as a delivery driver for less than six months. He left that job because his knee was causing him too much pain to work. Plaintiff then worked as a car washer and detailer for three months, until his employer went out of business. He was able to perform that work because his boss permitted him to take frequent breaks, eight to ten a day. After that, for a period of two weeks, Plaintiff worked in an auto parts warehouse, but left because he was not able to sit down. Plaintiff also worked at an auto body shop doing manual labor for "less than a year." Plaintiff returned to his job as a tow truck driver for a period in 2000, and finally worked as an ice deliveryman for about four months, quitting in August 2000 because of his physical condition. During the years that he worked, Plaintiff earned between $377

(in 1999) and $13,111 (in 1997) a year. Tr. at 77-79, 205-220.

**Medical Record**

Plaintiff was born with genu varum in his right knee (a bowed leg). He had arthroscopic surgery on this knee in 1991. Tr. at 180.

On March 6, 2001, Plaintiff presented at an emergency department complaining of lower back and right knee pain related to an injury suffered as a result of an altercation involving wrestling. At this time Plaintiff was living in Nevada. He was diagnosed with a lumbar sprain. Tr. at 141-42. On March 16, 2001, Plaintiff visited Anthony B. Serfustini, M.D., at an orthopedic clinic, complaining of continued right knee pain and discomfort over the previous nine years, and was diagnosed with early degenerative changes to the right knee, but no gross instability. Range of motion of the right knee was limited to 130 degrees (of a normal range of 150 degrees). X-rays revealed medial and lateral joint space narrowing. Plaintiff was prescribed Vioxx,[2] physical therapy, and activity modification, and was given a work restriction of no prolonged walking, standing, or climbing. He was deemed to be able to return to work on April 27, 2001. Tr. at 134-38.

On April 27, 2001, Plaintiff was seen by Madhu Rao, D.O., at the same orthopedic clinic, complaining of right knee pain combined with grinding and swelling after prolonged usage, and numbness of both feet after prolonged standing. Plaintiff reported

---

[2]     Vioxx (rofecoxib) is a nonsteroidal anti-inflammatory drug used to reduce pain and inflamation. Physicians Desk Reference 2213 (56th ed. 2002) ("PDR").

that he had had these problems for a long time. Dr. Rao diagnosed him with degenerative joint disease of the right knee, bilateral pes planus (flatfeet) with posterior tibial tendon insufficiency,[3] and bilateral tarsal tunnel syndrome.[4] An x-ray revealed arthritic changes to the right knee. Range of motion of this knee was limited to 130 degrees. Plaintiff was prescribed an Ace sleeve and orthotics and given a work restriction of no prolonged walking, standing, or climbing. Tr. at 130-33.

On June 15, 2001, Plaintiff, complaining of continued discomfort, returned to Dr. Serfustini, who diagnosed Plaintiff as morbidly obese and noted crepitation at his right knee, degenerative joint disease of the right knee, bilateral pes planus, and tarsal tunnel syndrome. Orthotics and Vioxx were prescribed and weight loss was recommended. Dr. Serfustini stated that Plaintiff was disabled from performing his previous job as a mechanic, and that he was not currently a candidate for invasive studies or injections.[5] Tr. at 128.

On October 19, 2001, Plaintiff returned to the same orthopedic clinic, where Wari

---

[3]   Posterior tibial tendon insufficiency is a condition caused by injury or degeneration in which the posterior tibial tendon, which connects the shin bone to a bone in the arch of the foot, can no longer support the arch of the foot, which leads to flatfoot. http://www.arthroscopy.com.

[4]   Tarsal tunnel syndrome results from irritation caused by pressure on the sensory nerve that passes through the tarsal tunnel in the ankle and can cause numbness and tingling in the foot and toes. It is analogous to carpal tunnel syndrome in the hand and wrist. http://www.medicinenet.com.

[5]   The progress note uses the word evasive, which the Court assumes is a transcription error.

L. Wabara, M.D., diagnosed Plaintiff with varus "knees," patellofemoral arthritis (arthritis below the kneecap), and morbid obesity. Dr. Wabara recommended weight loss and placed Plaintiff on Naprosyn[6] and Tylenol #4,[7] and recommended that Plaintiff refrain from working for three months. Tr. at 139, 155.

On January 22, 2002, Plaintiff presented to Dr. Serfustini with continued discomfort and was diagnosed with moderately advanced tricompartmental disease (arthritis affecting all three compartments of the knee) in his right knee. Range of motion was limited to 123 degrees, and the doctor noted pain with extension and flexion. Dr. Serfustini recommended that Plaintiff continue treating his condition with antiinflammatory medications and an occasional pain pill, and said that Plaintiff was unable to perform any type of construction work. Tr. at 154.

On March 1, 2002, Plaintiff, complaining of right knee pain, returned to the same clinic and was seen by Roman Schwartsman, M.D., who diagnosed moderate to severe tricompartmental degenerative joint disease in the right knee. Despite Plaintiff's request, Dr. Schwartsman refused to declare Plaintiff totally disabled, "in light of the fact that the rest of him is unimpaired." Dr. Schwartsman's note stated that Plaintiff was going to see Dr. Serfustini to obtain total disability. Tr. at 153.

---

[6] Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug prescribed for the treatment of arthritis, among other conditions. PDR 2267.

[7] Tylenol 4 contains 300mg of acetaminophen and 60mg of codeine, a narcotic, and is prescribed for pain. PDR 2595.

In progress notes dated April 2, 2002, Dr. Serfustini wrote that Plaintiff's recent xrays showed moderate to severe tricompartmental osteoarthritic disease in his right knee. Physical examination revealed "painful arc of motion from -10 to 105 degrees." The doctor recommended maintaining Plaintiff on conservation measures because he was too young for a total knee replacement and needed to lose weight. Dr. Serfustini prescribed Vioxx and a light exercise program and declared Plaintiff permanently disabled from construction. Tr. at 152.

On December 4, 2002, after returning to St. Louis, Plaintiff was treated at St. Louis ConnectCare Clinic, complaining of right knee and lower back pain. The records reveal that on that date his weight was 328 pounds. X-rays of Plaintiff's right knee and lower back on December 26, 2002, were within normal limits. By February 5, 2003, Plaintiff's weight had risen to 350 pounds. Tr. at 162, 169-71.